The next case is Orlando Landbrook versus Northrop Grumman. This is a case of Northrop Grumman versus Northrop Grumman. Are there any different comments? No, we agree. Your Honor, we don't press any confidentiality in this case. Thank you very much. Mr. Blumenthal, you may proceed. Thank you, Your Honor. I'm Jack Blumenthal for the plaintiffs. May it please the Court, on a motion for summary judgment, the district court cannot disregard relevant evidence, can't weigh evidence, and here the district court did both. As a result, we were not given a chance to try our infringement opinion, even though we had two experts who testified that there was infringement in their opinion, and even though Tepe's own evidence was consistent with those opinions. And in holding that Warner-Lambert couldn't try to prove that Tepe's gabapentin has less than 20 parts per million of anion of mineral acid, the court, the district court, disregarded several pieces of crucial evidence, and I would like to address two of them briefly. First, it's undisputed that before the 482 patent issued in 2000, Tepe's gabapentin had less than 20 parts per million of total chloride. It had 6 to 7 parts per million. That's an undisputed fact. It's undisputed that after the patent issue, Tepe changed its process in the spring of 2000, and that the process, the part of the process where the mineral acid was removed, using an excess of TBA, was not changed, and therefore the process did not increase the acidic chlorides. Tepe's own data showed that, and if you look at the chart that's on our opening brief, page 24, it shows that the pH before the change, after the change, was in the same range, didn't change that, didn't change. Based on that evidence, our chemistry expert, Professor Bartlett, testified that the acidic chloride levels did not increase in Tepe's gabapentin starting in 2000. Now, the district court mentioned Warner-Lambert's contention on that point twice in its opinion, but it didn't address it anywhere in the analysis. Was there any sort of Galbraith motion below? There was no Galbraith motion below, and in fact, as we put in our reply brief, Your Honor, there was a representation by the defendants that they were only challenging the limits of precision, they were not challenging the validity of the data. But they seemed to have gone beyond that kind of appeal, I suppose. They had gone beyond that kind of appeal, but they expressly told Judge Lifflin to ignore any challenges to validity because those created fact issues and were not appropriate on summary judgment. But we put out all of the data also on the Teba process, the six to seven parts per million, the change, which didn't change the excess of TBA in our opening brief in this court, and none of that was contested in the answering brief either. Let me just posit something to you. Suppose that I agree with your plain construction, and I understand that you tested five Teba samples post-process change, and I'm looking in particular at the appendix at 1659, which is the chart that shows the titrated pH all the way through. And so by my calculation, four of the five samples could not possibly, if we assume that you did write what you say you did and all of that, four of the five samples could not possibly have more than 20 parts per million of acidic chloride. That's correct. In fact, I think all five couldn't possibly have. The fifth one, hold on. The fifth one, though, if we agree that it's plus or minus five error rate in parts per million, which I think your expert, Mr. Barlow, was the one who suggested that's what it is, plus or minus five. Am I right? Yes. Okay. So the fifth one, it seems to me that if you add plus or minus five BPMs there, it could possibly be over 20. If you look at our, I believe it's our opening brief at page 36, we graphed the plus or minus five, and I believe even for that, with the plus five it falls below 20. But certainly taking your point, there can be no question that four of the five samples were below 20. Here's my question to you. At what point do you think we ought to say that you have established your burden such that summary judgment shouldn't be granted? Suppose in this case it's four of five. Do you think that's a clear showing if I say four of five? What if it was one of five? Oh. I know there's some found facts, but. . . I understand, Your Honor, but what we have here was more than one thing. And what we had to show was that there was a genuine issue of fact because it was their motion. And what we showed was, one, that TEPA had six to seven parts per million, and the process change didn't affect that. And on the point Your Honor is making. . . I know all the other points you're going to point me to, but I just want you to focus in on just my little hypothetical, which I know is not these exact facts, but I'm trying to understand where to draw the line in that regard. And I know you're pointing me to the other evidence and saying. . pandemic . . . . the expert . Dafür . was not . p . . . . There is nothing in the specification . In the in the flame in the prosecution history Judge a little point in the I definitely understand your point about the mix whether it's in the mix basically and here's my question. Could it still be in the mix despite the fact that it's in the shell or a coating around the shell as I understand some of the products use it all depends on whether it's digested in your stomach before it reaches your bowels and takes effect. It all depends on whether or not it's going to cause more than .2% instability in the gut. Is that the issue? No, I don't think it is. I'll do that. In the text below which was not appealed and so is the law of the case the judge found that any amount of any one of those eight adjuvants including titanium dioxide any amount was removed the formulation from the scope of that and what we're saying is we have some of this stuff in our Did you say any of them anywhere or any of them? No, he did not reach the issue of where they were he just said if you have any of these in any amount that they are that that formulation does not fall within the scope. Here's why maybe we shouldn't reach that issue either because maybe that part of it is infringement and not plan construction and tell me if I'm wrong about this but isn't it possible that if you put these things in your coating they may or may not depending on how the product is digested affect the stability of gabapatin and that seems to me to be for the infringement analysis. I understand that point your honor but Judge Lifflin in his decision which was not appealed went beyond that he said I don't have to  materials actually affect the lactate formation in the capsulin and pallor they have this claim any formulation which contains those excipients and therefore it doesn't matter whether it's a miniscule amount, a minimous amount, any amount will remove that formulation from infringement. That was not appealed, that is the law of the case. Now what we're saying is the evidence shows at least with respect to tablets there is sufficient evidence in the record that shows with respect to tablets Warren and Lambert itself tested titanium dioxide as a colorant in the tablet coating found that it was inconsistent with stability and instead put talc in their tablet coating. That's part of the record Judge Lifflin relied on it and on that basis he should have said well, you know titanium dioxide in a tablet coating is an excipient for purposes of Claim 7. The only evidence that he points to for why these titanium dioxide in a coating could not be considered to be an adjuvant has to do with capsule shells and that evidence we submit was improper because all he was saying was Neurontin capsules contain some titanium dioxide, therefore that's not how I should construe the claim. He should not have done that. He should not have looked at what the commercial product was in order to determine what the claim was. I've used up almost all my time and it was... You were answering the question so we'll give Mr. Hobb five minutes and if needed we'll add a couple of minutes more. Okay. We've got more than ten minutes I understand. I would point to the Trondle declaration which Judge Lifflin refers to where he said talc had twenty times less of an effect on lactam formation than titanium dioxide. They also include gelatin which is an ingredient in the capsule shells in the list of ingredients in the Trondle and Gebhardt declarations. And I would say that in his in the Gebhardt declaration it's one of the categories of excipients which Gebhardt says is relevant is coloring agents. Well the coloring agents are only going to occur in the coating or in the capsule shells. I think that there's no way that these claims... You're not using your colleague's time. I understand your argument. The other issue that I wanted to talk with was our alternative argument about the construction of the claim to twenty parts per million of a mineral acid, but I will cede that time to my colleague. Thank you. You have fifteen minutes, so we'll give you about two minutes. Good morning, Your Honors. I would like to address the question of claim construction of anion of a mineral acid. Key to this whole case, central to everything. Down below, the court construed the term precisely as one of Lambert asked it to and said that anion of a mineral acid means anion derived from a mineral acid. The court imported process limitations into that phrase and was in error. The claim term, the court said was ambiguous in the claim and in fact at 886 says it supports both sides' position. The court then went to the specification and said specification is no aid to me because this phrase, this term is nowhere to be found in the specification. It's not defined in the specification and that's the fact. So then the judge went to the file history and what the judge below did is he picked certain portions of that file history that he found to be supportive of Lorne Lambert's position and as it's very I think set forth in our brief, step by step it goes through the file history, but our position is simply this. The claim term is not ambiguous. It's plain and clear on its face. It's an anion less than 20 ppm which is a weight measure of an anion of a mineral acid. There's nothing ambiguous about that. This is about anions, less than 20 ppm of anions not less than 20 ppm of mineral acids and by the way that phrase anion of a mineral acid is really a limited phrase. It's not all anions it's anions of a certain class the class meaning anions that are capable of forming a mineral acid. ...